**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| Windle Pompey, Valeska Schultz and Melanie Waugh, individually and on behalf of a class of all other persons similarly situated, and on behalf of the Edward D. Jones & Co. Profit Sharing and 401(k) Plan, <br><br> Plaintiffs, <br><br> v. <br><br> EDWARD D. JONES & Co. L.P., the Edward Jones Investment and Education Committee, Brett Bayston, Bonnie Caudle, Mark Vivian, Stina Wishman, Jan-Marie Kain, Linda Banniester, Ann Echelmeier, Curtis Long, David Gibson, Ken Blanchard, Jason Jonczak, Julie Rea, Asma Usmani, Glenn Kolod, Juli Johnson, Jess Dechant, and Peggy Robinson <br><br> Defendants. | Case No. 4:16-cv-01346-RWS <br><br><br> **CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)** |

## I.     INTRODUCTION

1.     Plaintiffs Windle Pompey, Valeska Schultz and Melanie Waugh, individually and on behalf of a class of similarly situated participants (individually "Plaintiff" and collectively "Plaintiffs") in the Edward D. Jones & Co. Profit Sharing and 401(k) Plan (formerly Edward D. Jones & Co. Profit Sharing and Deferred Compensation Plan) (hereafter the "Plan"), and on behalf of the Plan, bring this action for breach of fiduciary duty and prohibited transactions under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against Edward D.

Jones & Co L.P. ("Edward Jones"), the Edward Jones Investment and Education Committee (the "Committee"), and its members during the proposed class period ("Jane and John Does 1–25").

2.     Throughout the Class Period, Edward Jones populated the Plan with investment options of its Preferred Partners and other investment managers with corporate relationships with Edward Jones. Edward Jones marketed, and continues to market, funds from these managers to its clients. In exchange, it has received millions of dollars in payments from these managers.

3.     The profits of Edward Jones are shared among the general and limited partners of Edward Jones, including, upon information and belief, the members of the Investment and Education Committee, which determines the Plan's investments.

4.     Plaintiffs bring this action by and through their undersigned attorneys based upon their personal knowledge and information obtained through counsel's investigation. Plaintiffs anticipate that discovery will uncover further substantial support for the allegations in this Complaint.

## II.     NATURE OF THE ACTION

5.     The ERISA fiduciary obligations of retirement plan fiduciaries to the participants and beneficiaries of a plan are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602 (8th Cir. 2009).

6.     When selecting investments for a retirement plan, plan fiduciaries are required to: perform with undivided loyalty; act prudently; and defray reasonable plan expenses. ERISA §404(a)(1), 29 U.S.C. §1104(a)(1).

7.     Defendants, who during the Class Period are or were fiduciaries of the Plan, have violated their fiduciary duties and engaged in prohibited transactions with assets of the Plan.

8.      Defendants, during the Class Period, were responsible for selecting, monitoring, and removing the investments in the Plan. The individual Defendants were officers or employees of Edward Jones. Instead of acting for the exclusive benefit of the Plan and its participants and beneficiaries with respect to managing the Plan's assets, these Defendants acted for the benefit of Edward Jones by forcing the Plan into investments that charged excessive fees that benefitted the mutual fund partners of Edward Jones.

9.      Defendants also caused the Plan to pay excessive recordkeeping and plan administration fees to the Plan's record-keeper, Mercer HR Services, Inc. According to paperwork filed by Defendants on behalf of the Plan, the Plan's payments to Mercer HR Services, Inc., the Plan's record-keeper, increased by 314% between 2010 and 2014 even though market rates for recordkeeping services declined over that period and even though the number of Plan participants only increased by 22%.

10.      This class action is brought on behalf of participants in the Plan who participated from August 19, 2010 through entry of judgment (the "Class Period").

### III.    JURISDICTION AND VENUE

11.      **Subject Matter Jurisdiction.** This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it is a civil action arising under the laws of the United States, and pursuant to ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

12.      **Personal Jurisdiction.** This court has personal jurisdiction over Defendants because they reside and/or transact business in and have significant contacts with this District, and because ERISA provides for nationwide service of process, ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), and the Plan is and was administered in this District and the breaches of ERISA took place herein. This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P.

4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Missouri.

13.     **Venue.** Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan is and was administered in St. Louis, Missouri, within this District, the breaches of ERISA took place in this District, and/or a Defendant resides or may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because a defendant resides and/or does business in this District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## IV.     PARTIES

14.     Plaintiff Windle Pompey is a citizen and a resident of Maricopa, Arizona. She participated in the Plan during the Class Period. As a participant, and within the applicable statute of limitations, Plaintiff Pompey invested in the Edward Jones Growth Fund and the Edward Jones Growth & Income Fund.

15.     Plaintiff Valeska Schultz is a citizen and a resident of Brentwood, California. Plaintiff participated in the Plan during the entire Class Period. As a participant, and within the applicable statute of limitations, Plaintiff invested in the "Profit Sharing – Balanced Toward Growth" portfolio ("Balanced Toward Growth Portfolio").

16.     The Balanced Toward Growth Portfolio combines numerous funds with the "objective [] to emphasize growth and rising income potential with a secondary goal of current income." During the Class Period, the Balanced Toward Growth Portfolio has included investments in the following mutual funds: American Funds New World; Goldman Sachs Small Cap Value; American Funds Fundamental Investors; Franklin Templeton Mutual Discovery; Dodge & Cox Income; American Funds Bond Fund of America; Munder Mid Cap Core Growth; Champlain Mid

Cap; Invesco Mid Cap Core Equity; Hartford Dividend Growth; Dodge & Cox International Stock;

Lord Abbett Core Fixed Income; Hartford Capital Appreciation; American Funds Small Cap World;

American Funds EuroPacific Growth; Invesco Comstock; American Funds Capital World Growth

& Income; American Funds Capital World Bond; Federated Kaufmann; T.Rowe Price Blue Chip

Growth; American Funds New Perspective BlackRock Equity Dividend; Lord Abbett Bond

Debenture; and MFS Growth.

17.     Plaintiff Melanie Waugh is a citizen and a resident of Oroville, California. Plaintiff

participated in the Plan during the Class Period. As a participant, and within the applicable statute of

limitations, Plaintiff invested in the Balanced Toward Growth Portfolio.

18.     Plaintiffs, like substantially all plan participants and beneficiaries, were not provided

any information regarding the substance of deliberations, if any, of Defendants concerning the

Plan's menu of investment options or selection of service providers during the Class Period.

Plaintiffs otherwise had no knowledge of the substance of the deliberations, or of the nature of the

investments they selected in the Plan beyond what was provided to them by the Plan. Plaintiffs

discovered their claims shortly before commencing this action.

19.     Defendant Edward D. Jones & Co. L.P.,("Edward Jones"), the Plan Sponsor, is a

partnership with its principal place of business in Des Peres, Missouri. Edward Jones is a wholly

owned subsidiary of The Jones Financial Companies, L.L.L.P.

20.     Defendant Edward Jones Investment and Education Committee is comprised of

employees and/or partners of Edward Jones. The Committee has the authority to determine the

investment funds made available under the Plan and to develop and oversee the implementation of

any investment education program.

21.     Defendant members of the Committee and/or Edward Jones partners or executives

in charge of Human Resources during the Class Period, who are unknown to Plaintiffs. The members

5

of the Committee have included general partners and/or limited partners of Edward Jones, who personally received, through the partnership, portions of the profits of Edward Jones. The members of the Committee are or were fiduciaries to the Plan by virtue of their status as members of the fiduciary Committee, exercising their authority to determine the investment funds made available under the Plan, to select maintain or remove any funds from the Plan, and to develop and oversee the implementation of any investment education program.

22.     The following Defendants have served as members of the Committee at the times relevant herein:

a.   Brett Bayston;

b.   Bonnie Caudle;

c.   Mark Vivian;

d.   Stina Wishman;

e.   Jan-Marie Kain;

f.   Linda Banniester;

g.   Ann Echelmeier;

h.   Curtis Long;

i.   David Gibson;

j.   Ken Blanchard;

k.   Jason Jonczak;

l.   Julie Rea;

m.  Asma Usmani;

n.   Glenn Kolod;

o.   Juli Johnson;

p.   Jess Dechant; and

q.  Peggy Robinson.

23.    Defendants are or in the Class Period were fiduciaries to the Plan within the meaning of ERISA §§3(21)(A)(i) and (iii), 29 U.S.C. §§1002(21)(A)(i) and (iii), and parties in interest to the Plan within the meaning of ERISA §§3(14)(A) and (C), 29 U.S.C. §§1002(14)(A) and (C).

## V.    FACTS

### A.  The Plan and Administration of the Plan

24.    The Plan is an employee benefit plan within the meaning of ERISA §3(3), 29 U.S.C. §1002(3), which is subject to the provisions of Title I of ERISA pursuant to ERISA §4(a), 29 U.S.C. §1003(a).

25.    The Plan is also an "employee pension benefit plan" or "pension plan" as defined by ERISA §3(2)(A), 29 U.S.C. §1002(2)(A), and a "defined contribution plan" or "individual account plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).

26.    The Plan is a defined contribution profit sharing and 401(k) plan established by Edward Jones under the provision of Section 401(a) of the Internal Revenue Code.

27.    The Plan covers eligible employees of Edward Jones, including its subsidiaries.

28.    Edward D. Jones & Company is the Plan Administrator. Accordingly, it is responsible for selecting, monitoring, and removing the investment options in the Plan.  At some or all times during the Class Period, it designated the Committee to carry out this duty. The Committee's individual members include partners of Edward Jones, and as such share in the profits of Edward Jones. They are also officers and/or employees of Edward Jones or its affiliates, and are not independent of Edward Jones.

29.     The Committee has the authority to determine the investment funds made available under the Plan and to develop and oversee the implementation of any investment education program.

30.     Participants in the Plan have the opportunity to direct the investment of the assets allocated to their individual accounts into the investment options approved by the Committee and offered by the Plan, and the return on those investments are credited to each participant's account.

31.     The Plan's benefits are funded by participants' voluntary tax-deferred contributions and by employer matching contributions.

32.     The Plan's most recent Form 5500 filing with the U.S. Department of Labor states that at the end of the 2014 plan year the Plan had 35,929 participants and beneficiaries with account balances. At that time, the Plan had assets of over $3.9 billion.

33.     During the Class Period the Plan has invested in at least 53 different investment options, of which three were managed by Defendants and at least 40 more were managed by Partners or Preferred Partners of Edward Jones.

**B.  Defendants' Used Plan Assets to Benefit its Mutual Fund Partners**

34.     Edward Jones markets and sells mutual funds to its clients, as well as to the Plan.

35.     The mutual fund companies Edward Jones markets pay Edward Jones a portion of all fees they receive from the assets Edward Jones steers into their funds. These payments are called revenue-sharing and they include both Annual Asset Fees and Sales Fees. They are calculated based on the total contributions and/or assets made by Edward Jones clients. Edward Jones also receives hundreds of millions of dollars per year in Networking and Shareholder Accounting Fees from partner mutual fund companies, like those included in the Plan.

8

36.     During the Class Period, Asset Fees have ranged from 2.4 basis points (bps) to 13 bps.[1]

37.     Annual Asset Fees are based on the value of assets under management no matter when they were invested. Sales Fees are one-time payments based on the amount of new money contributed to the funds by the Plan and other Edward Jones customers in the year in which the contribution was made.

38.     In addition, certain of the funds marketed by Edward Jones, and most of the funds in the Plan, are managed by "Preferred Product Partners" of Edward Jones. As consideration for the asset fees and sales fees "shared" with Edward Jones by the Preferred Product Partners, Edward Jones provides them with greater access to certain information about its business practices, frequent interactions with Edward Jones financial advisors, marketing support and educational presentations. Certain non-preferred product partners also receive this benefit if they also agree to revenue-sharing with Edward Jones.

39.     These sales and asset fees are payments to Edward Jones for selling funds to customers.

40.     Asset Fees and Sales Fees are negotiated between Edward Jones and the revenue-sharing mutual fund companies periodically including during the Class Period. Revenue sharing is also paid to Mercer, the Plan's record-keeper.

41.     In 2014, Edward Jones reported a profit of $770 million, of which $153 million came from mutual fund revenue-sharing.

42.     Edward Jones almost exclusively populates the Plan with mutual funds managed by Partners or Preferred Partners of Edward Jones.

---

[1] One basis point is equal to 1/100 of one percent. Thus, a 13 basis point fee equates to $1,300 per $1 million invested.

43.     Plan participants who do not make an affirmative selection of funds are placed in pre-set portfolios, which automatically invest the Participant in a collection of funds, all of which are actively managed and most or all of which are Partners or Preferred Partners of Edward Jones. Plan Participants may also affirmatively select these pre-set Portfolios.

44.     The Plan is harmed by revenue-sharing payments in that they have or had required the Plan to: (1) invest in revenue-sharing mutual funds, instead of institutional investment products like separate accounts; (2) invest in revenue-sharing share classes of these mutual funds, so that they do not enjoy the lower cost of non-revenue-sharing share classes of identical investment products; (3) invest in funds that are less appropriate for the Plan and likely to underperform other options; and (4) cause the Plan to pay excessive recordkeeping and administration fees.

45.     Likewise, the Plan was harmed by the inclusion of three mutual funds managed by Edward Jones, in that the Funds were maintained in the Plan in order to generate fees for the benefit of Edward Jones and its partners, including, upon information and belief, certain Defendants who were fiduciaries to the Plan prior to September, 2011. These Funds, upon information and belief, underperformed prudent alternatives until their removal from the Plan in September, 2011. Upon their removal, participant balances in the Edward Jones Growth Fund, the Edward Jones Growth & Income Fund, and the Edward Jones Income Fund were mapped into the Balanced Toward Growth Fund.

46.     The scope of the fiduciary duties and responsibilities of these Defendants includes discharging their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries and defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

47.    When selecting investments for a retirement plan, plan fiduciaries are required to: perform with undivided loyalty; act prudently; and defray reasonable plan expenses. ERISA §404(a)(1), 29 U.S.C. §1104(a)(1).

48.    Defendants, who during the Class Period are or were fiduciaries of the Plan, have violated their fiduciary duties and engaged in prohibited transactions with assets of the Plan.

49.    Defendants, during the Class Period, were responsible for selecting, monitoring, and removing the investments in the Plan. The individual Defendants were General and/or Limited Partners of Edward Jones, entitled to a share of the profits of the company. Instead of acting for the exclusive benefit of the Plan and its participants and beneficiaries with respect to managing the Plan's assets, these Defendants acted for the benefit of Edward Jones by forcing the Plan into mutual funds managed by Partners and Preferred Partners of Edward Jones.

50.    Edward Jones admits that its revenue sharing arrangements create "potential conflict[s] of interest in the form of an additional financial incentive and financial benefit to the firm, its financial advisors and equity owners."[2]

51.    The Plan's investments show a high correlation to mutual funds offered by mutual fund families that pay Edward Jones the most money. Of the 12 mutual fund families listed in the 2015 Edward Jones revenue sharing disclosure, eight have fund offerings in the Plan. The eight mutual fund family Partners (or Preferred Partners) represented in the Plan accounted for 92% of the revenue sharing paid by mutual fund families to Edward Jones in 2015. Every single Partner or Preferred partner that paid Edward Jones more than $10,000,000 in revenue sharing in 2015 was represented in the Plan. Indeed, approximately 80% of Plan assets were invested in mutual funds

---

[2] Edward Jones, Revenue Sharing Disclosure 2015.

offered by Partners or Preferred Partners of Edward Jones. And approximately 80% of funds offered in the Plan in 2014 came from Partners or Preferred Partners.[3]

52.     As the table below reflects, Partners and Preferred Partners enjoyed unparalleled access to Plan assets in correlation to the monies they paid to Edward Jones.

| Fund Family | % of Plan Assets | Dollars Paid to EJ in 2015 | No. of Funds In Plan |
|---|---|---|---|
| America Funds | 49.70% | $55,000,000 | 18 |
| Franklin Templeton | 4.38% | $31,100,000 | 1 |
| Invesco | 6.32% | $21,800,000 | 3 |
| Hartford | 5.65% | $18,500,000 | 2 |
| MFS | 2.84% | $15,000,000 | 2 |
| Lord Abbett | 6.23% | $13,700,000 | 3 |
| JP Morgan | 0.78% | $3,000,000 | 1 |
| Goldman Sachs | 3.97% | $2,400,000 | 1 |
| Other | 20.13% | $0 | 8 |

53.     By including and failing to remove these Funds, Defendants failed to make Plan investment decisions based solely on the merits of the investment funds and what was in the interest of participants. Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, and therefore in breach of their fiduciary duty of loyalty under ERISA §404(a)(1)(A); 29 U.S.C. §1104(a)(1)(A).

54.     The same conduct by the Defendants shows a failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in

---

[3] Plan Assets are identified based on the Plan's most recent Form 5500 filing with the U.S. Department of Labor, which is for the 2014 plan year. All Funds identified have been imprudently invested in an excessively expensive share class for multiple years.

the conduct of an enterprise of like character and with like aims. Defendants therefore breached

their fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

**C. The American Funds Money Market Fund**

55.    Stable value funds and money market funds are two investment vehicles designed to

preserve principal while providing a return.

56.    Stable value funds are a common investment in defined contribution plans and in

fact are designed specifically for use in large defined contribution plans.

57.    The structure of stable value funds allows them to outperform money market funds

in virtually all market conditions and over any appreciable time period. See, *Abbott v. Lockheed Martin

Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); see also Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the

Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and

Money Market*, 39 AKRON L. REV. 9, 20–27 (2006).

58.    Stable value funds hold longer duration instruments generating excess returns over

money market investments. Stable value funds also provide a guaranteed rate of return to the

investor, referred to as a crediting rate, and protect against the loss of principal and accrued interest.

This protection is provided through a wrap contract issued by a bank, insurance company or other

financial institution that guarantees the book value of the participant's investment.

59.    Even during the period of market turbulence in 2008, "stable value participants

received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable

Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009).[4]

---

[4] Available at http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf.

60.     Because they offer higher returns than money market funds, greater consistency of returns, and less risk to principal, large defined contribution plans commonly offer stable value funds to participants.

61.     A 2011 study from Wharton Business School comparing money market and stable value funds found that "any investor who preferred more wealth to less wealth should have avoided investing in money market funds when [stable value] funds were available, irrespective of risk preferences." David F. Babbel & Miguel A. Herce, *Stable Value Funds: Performance to Date*, at 16 (Jan. 1, 2011), available at http://fic.wharton.upenn.edu/fic/papers/11/11-01.pdf (last accessed June 24, 2016).

62.     According to the 2015 Stable Value Study published by MetLife, over 80% of plan sponsors offer a stable value fund. MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors* at 5 (2015).[5] The study also notes that stable value returns were "*more than double*" the returns of money market funds from 1988 to 2015, and 100% of stable value providers and almost 90% of financial advisors to defined contribution plans "agree that stable value returns have outperformed money market returns over the last 25 years." *Id.* at 7 (emphasis added).

63.     Unlike the majority of defined contribution plans, the Plan has not offered a stable value fund. Instead, the Plan offered the American Funds Money Market Fund,[6] (the "Money Market Fund") a fund managed by Edward Jones' Preferred Partner, American Funds.

64.     The Plan and its participants have not received *any return at all* from their investment in the Money Market Fund since it was first sold on May 1, 2009. In real terms, investors in this most-conservative options have lost over 12% of their buying power over the Class Period, the same

---

[5] Available at https://www.metlife.com/assets/cao/institutional-retirement/plan-sponsor/stable-value/Stable-Value-Vs-Money-Market/2015_StableValueStudyWebFinal.pdf.
[6] The Fund was renamed the American Funds U.S. Government Money Market Fund on April 1, 2016.

as if they had hidden their retirement savings under a mattress. Had Defendants used a comparable stable value fund, the plan participants would have seen their assets grow by over 22% during that period.

65.    Had these assets been invested in a stable value fund instead, they would have had inflation-beating returns. For example, one alternative, the Vanguard Stable Value Fund has enjoyed the following returns:

| Fund | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|------|------|------|------|------|------|------|------|
| Stable Value | 3.66% | 4.06% | 3.56% | 2.68% | 2.06% | 2.00% | 2.21% |
| Inflation | 2.63% | 1.63% | 2.93% | 1.59% | 1.58% | -0.09% | 1.37% |
| Plan Money Market | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

66.    Unlike the American Funds, Vanguard is not a Preferred Partner of Edward Jones.

67.    By including and failing to remove the Money Market Fund, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

68.    Prudent fiduciaries of large defined contribution plans conduct an analysis to determine how best to structure a conservative, asset-protection investment option for the Plan. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer a stable value fund instead of a non-income producing money market fund.

69.    Upon information and belief, Defendants failed to undertake such analysis when it selected and retained the Money Market Fund for the Plan.

15

70.     Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify funds that are no longer expected to outperform their benchmarks or other alternative investments, and prudent fiduciaries replace such funds better anticipated performance and lower or comparable risk.

71.     Defendants' fiduciary duties are among the "highest [duties] known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982). Consistent with these fiduciary duties, Defendants had a fiduciary duty to Plaintiffs, the Plan, and the other participants in the Plan to offer only prudent investment options. A fiduciary has "a continuing duty of some kind to monitor investments and remove imprudent ones" and "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l.*, 135 S.Ct. 1823, 1829 (2015). Defendants therefore breached their fiduciary duty of prudence under ERISA §404(a)(1)(B); 29 U.S.C. §1104(a)(1)(B).

72.     The Plan lost in excess of $15 million during the class period as a result of losses sustained by the Money Market Fund compared to stable value alternatives.

## D. Alternative Funds with Lower-Cost and Better Prospects for Future Performance Were Available for the Plan

73.     Large retirement plans, like the Plan, have substantial bargaining power to negotiate low fees for investment management services.

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

16

Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, Plan Sponsor Magazine (Jan. 2011).[7]

74.     Lower-cost institutional share classes of mutual funds are available to institutional investors, like the Plan, that meet the minimum investment amounts for these share classes. In addition, large retirement plans can hire investment advisers directly to manage separate accounts for the plan within plan-specific investment parameters and low investment management fees. As the Department of Labor recognized, large defined contribution plans with assets over $500 million "can realize substantial savings" through separate accounts, including "[t]otal investment management expenses can commonly be reduced to *one-fourth* of the expenses incurred through retail mutual funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., *Study of 401(k) Plan Fees and Expenses* §2.4.1.3 (Apr. 13, 1998) (emphasis added).[8]

75.     Despite these lower-cost options, Edward Jones has and continues to offer Plan investment options with a higher cost than were and are available for the Plan based on its size, such as separate accounts and collective trusts.

76.     Moreover, for the *exact same mutual fund option*, the Plan has offered higher-cost share classes of identical mutual funds than were available to the Plan. On June 27, 2016, only after learning of Plaintiffs' investigation into their Plan, Defendants moved the Plan into the less expensive share classes of most of the mutual funds in the Plan.

77.     The lower-cost identical mutual funds to the Plan's mutual funds include and have included the following:

---

[7] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.
[8] Available at https://www.dol.gov/ebsa/pdf/401kRept.pdf.

| Plan Mutual Fund | Plan Assets[9] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost[10] |
|---|---|---|---|---|---|
| American Funds AMCAP Fund R5 (RAFFX) | $66,901,991 | 42 bps | R6 share class (RAFGX) | 37 bps | $149,236 |
| American Funds Bond Fund R5 (RBFFX) | $68,195,265 | 30 bps | R6 share class (RBFGX) | 25 bps | $189,501 |
| American Funds Capital Income Builder R5 (RIRFX) | $102,154,230 | 34 bps | R6 share class (RIRGX) | 30 bps | $215,864 |
| American Funds Capital World Growth & Income (RWIFX) | $171,220,127 | 49 bps | R6 share class (RWIGX) | 45 bps | $354,207 |
| American Funds Capital World Bond (RCWFX) | $67,652,863 | 58 bps | R6 share class (RCWGX) | 53 bps | $170,426 |
| American Funds EuroPacific Growth (RERFX) | $156,824,052 | 54 bps | R6 share class (RERGX) | 50 bps | $300,861 |
| American Funds Fundamental Investors (RFNFX) | $238,511,002 | 35 bps | R6 share class (RFNGX) | 31 bps | $459,732 |
| American Funds Growth Fund (RGAFX) | $189,769,027 | 38 bps | R6 share class (RGAGX) | 33 bps | $470,555 |
| American Funds High Income Fund (RITFX) | $22,199,639 (2012) | 39 bps | R6 share class (RITGX) | 34 bps | $23,803 |

[9] Plan Assets are identified based on the Plan's most recent Form 5500 filing with the U.S. Department of Labor, which is for the 2014 plan year. If the fund was removed from the Plan prior to December 31, 2014, a different year is indicated. All Funds identified have been imprudently invested in an excessively expensive share class for multiple years.

[10] Estimated for the Class Period (2010–2016) based on 5500s for Plan years 2010–2014 and an assumption that assets remained constant after 2014. Plaintiffs allege these costs were excessive throughout the statutory period. The Plan finally moved to the cheaper, R6 share class, in June, 2016.

| Plan Mutual Fund | Plan Assets[9] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost[10] |
|---|---|---|---|---|---|
| American Funds Income Fund (RIDFX) | $101,741,369 | 32 bps | R6 share class (RIDGX) | 28 bps | $177,798 |
| American Funds Investment Co. (RICFX) | $103,877,544 | 35 bps | R6 share class (RICGX) | 30 bps | $250,074 |
| American Funds New Economy Fund (RNGFX) | $37,996,516 | 50 bps | R6 share class (RNGGX) | 46 bps | $69,593 |
| American Funds New Perspective (RNPFX) | $174,383,250 | 49 bps | R6 share class (RNPGX) | 45 bps | $316,352 |
| American Funds New World (RNWFX) | $108,069,510 | 70 bps | R6 share class (RNWGX) | 65 bps | $242,403 |
| American Funds Small Cap World (RSLFX) | $147,518,458 | 75 bps | R6 share class (RLLGX) | 71 bps | $275,475 |
| American Funds Government Sec (RGVFX) | $5,014,783 | 32 bps | R6 share class (RGVGX) | 27 bps | $16,775 |
| American Funds Washington Mutual (RWMFX) | $97,463,230 | 34 bps | R6 share class (RWMGX) | 30 bps | $179,374 |
| Franklin Templeton Income Fund Adv. Class (FRIAX) | $34,551,111 (2013) | 46 bps | FNCFX | 38 bps | $71,029 |
| Franklin Templeton Mutual Global (MDISX) | $172,487,883 | 99 bps | FMDRX | 84 bps | $1,242,184 |
| Hartford Capital Appreciation (ITHTX) | $126,674,054 (2012) | 80 bps | ITHVX | 76 bps | $113,826 |

| Plan Mutual Fund | Plan Assets[9] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost[10] |
|---|---|---|---|---|---|
| Hartford Dividend & Growth Fund (HDGTX) | $117,797,064 | 74 bps | HDGVX | 70 bps | $318,312 |
| Hartford Growth Opportunities (HGOTX) | $104,447,900 | 84 bps | HGOYX | 75 bps | $353,184 |
| Invesco Mid Cap Core Equity (GTAVX) | $74,133,127 | 83 bps | GTAFX | 74 bps | $315,646 |
| Invesco Comstock (ACSDX) | $152,823,696 | 58 bps | ICSFX | 39 bps | $1,338,039 |
| JPMorgan Core Bond (WOBDX) | $30,674,544 | 73 bps | JCBUX | 34 bps | $467,769 |
| Lord Abbett Bond Debenture (LBNYX) | $88,409,152 | 62 bps | LBNVX | 53 bps | $369,728 |
| Lord Abbett Core Fixed Income (LCRYX) | $105,006,889 | 46 bps | LCRVX | 36 bps | $492,344 |
| Lord Abbett Total Return (LTRYX) | $51,672,959 | 48 bps | LTRHX | 36 bps | $275,556 |
| MFS Bond (MFBJX) | $28,100,870 | 57 bps | MFBKX | 46 bps | $132,116 |
| MFS Growth (MFEJX) | $83,803,501 | 71 bps | MFEKX | 62 bps | $306,057 |
| Victory Munder Mid-Cap Core Growth Y (MGOYX) | $116,103,856 | 107 bps | MGOSX | 89 bps | $694,667 |
| Total | | | | | $13,042,270 |

78.    Each of these mutual funds, except for the Victory Munder Mid-Cap Core Growth Fund, was managed by a Preferred Product Partner of Edward Jones.

20

79.     The Plan qualified for the lower-cost share classes.

80.     Additional mutual funds for which Plaintiffs cannot currently determine the share class utilized may have also offered lower-cost share classes which would have been available to the Plan.

81.     As shown above, participants paid over $13 million in excessive fees based on Defendants' failure to utilize lower-cost share classes of identical mutual funds during the Class Period.

82.     The failure to select lower-cost share classes for the Plan's mutual fund options identical in all respects (portfolio manager, underlying investments, and asset allocation) except for cost demonstrates that either Edward Jones intentionally refused to move the Plan to a cheaper share class or that it failed to consider the size and purchasing power of the Plan when selecting share classes and engaged in no prudent process in the selection, monitoring, and retention of those mutual funds. Either explanation constitutes a violations of Defendants' fiduciary obligations to the Plan. See e.g., *Tibble v. Edison Int'l*, 2010 WL 2757153 at *30 (C.D. Cal. July 9, 2010) ("In light of the fact that the institutional share classes offered the exact same investment at a lower fee, a prudent fiduciary acting in a like capacity would have invested in the institutional share classes.").

83.     Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the lower-cost share class mutual fund options from August 19, 2010 to the present, Plan participants would have retained over $13 million more in their retirement savings, which would have grown even larger because it would have remained invested in the Plan.

84.     Had the amounts invested in all of the mutual fund options instead been invested in institutional products such as collective trusts and separately managed accounts from August 19, 2010 to the present, Plan participants would have saved tens of millions more.

21

**E.  Defendants Failed to Consider Index Alternatives**

85.    Academic and financial industry literature shows the importance of low fees in selecting investments. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis.* Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2009); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010) ("the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

86.    If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

87.    To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R.

French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000).

88.     Defendants did not include any low-cost index funds until 2013. When they did add three index funds in 2013 — out of 39 total options — Edward Jones did not map existing Plan assets into the index funds, and did not include the index funds in its pre-set asset allocation portfolios. As a result, few assets moved into these funds.

89.     As is generally understood in the investment community, passively managed investment options should be used in efficient markets such as large capitalization U.S. stocks, because it is difficult and extremely unlikely to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis.

90.     The efficiencies of the large cap market hinder an active manager's ability to achieve excess returns for investors.

> In conclusion, this study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

Burton G. Malkiel, *Returns from Investing in Equity Mutual Funds 1971 to 1991*, 50 J. FIN. 549, 571 (1995).[11]

91.     Academic literature overwhelmingly concludes that active managers consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks…The median active fund underperformed the passive

---

[11] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

index in 12 out of 18 years [for the large-cap fund universe]…The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P 500 Index fund.

***

The most dismal of comparisons for active managers are for large-cap domestic managers verses the S&P 500 Index.

Robert C. Jones, *Chapter 3: The Active verses Passive Debate: Perspectives of an Active Quant*, Active Equity Portfolio Management at 40, 53 (Frank J. Fabozzi ed.) (1998).

92.    Nobel Laureate William Sharpe also reached the same conclusion that active managers underperform passive managers net of fees. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 Fin. Analysts J. 7, 8 (January/February 1991).[12]

93.    The Plan's experience back this up. The Plan currently offers eight actively-managed large-cap mutual funds managed by Preferred Partners of Edward Jones. Defendants benchmark these funds against the S&P 500 Index, which can be easily replicated using any one of a number of investible index funds, including the Vanguard Institutional Index Fund (VIIIX), which would have been available to Defendants for inclusion in the Plan. As reported by Morningstar, during the class period, seven of the eight funds underperformed the S&P 500 and VIIIX. The table below shows the damages compared to VIIIX from the beginning the class period through May 30, 2016.

| Fund | Loses to the Plan (neg. numbers indicate outperformance) |
|---|---|
| American Funds AMCAP Fund | -$1,614,348 |
| American Funds Capital Income Builder | $35,818,659 |
| American Funds Fundamental Investors | $2,596,336 |

---

[12] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

| American Funds Growth Fund | $4,475,700 |
| American Funds Income Fund | $17,746,529 |
| American Funds Investment Company | $5,356,155 |
| American Funds New Economy | $1,046,136 |
| Franklin Templeton Mutual Global | $40,477,510 |

94.     Prudent fiduciaries of large defined contribution plans conduct an analysis to determine whether actively managed funds are expected to outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer an actively managed option for the particular investment style and asset class.

95.     Upon information and belief, Defendants failed to undertake such analysis when it selected and retained actively managed large-cap domestic mutual funds for the Plan.

96.     Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify funds that are no longer expected to outperform their benchmarks, and prudent fiduciaries replace such funds with index products or, in rare cases, prudent actively-managed investments with better anticipated performance through superior management and/or lower fees. This was not done.

97.     The collective underperformance of large-cap domestic equity funds in the plan, including the eight funds identified above, resulted in over $100 million of lost performance compared to the fund's S&P 500 benchmark and their index alternatives, such as VIIIX. The Plan was further harmed by the American Funds Mutual Fund, and Lord Abbett Large Cap Core Fund — which were also large-cap domestic equities funds and which were removed during the class period after underperforming the S&P 500 Index and the Plan's other investment alternatives.

**F.  Excessive Recordkeeping Fees**

98.    Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous record-keepers in the marketplace who are equally capable of providing a high level of service to a large defined contribution plan like the Plan. These record-keepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

99.    To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals, every 3–5 years.

100.    The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping and administrative services.

101.    Large defined contribution plans, like the Plan, experience economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per participant fee charged for recordkeeping and administrative services decline. These lower administrative expenses are readily available for plans with a greater number of participants.

102.    Many of the Plan's investment options revenue-shared with the Plan's record-keeper, Mercer. In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a

portion of the expense ratio—the asset-based fees it charges to investors—to the plan's record-keeper putatively for providing recordkeeping and administrative services for the mutual fund.

103.    Form 5500s filed by the Plan with the United States Department of Labor show that during the Class Period Mercer received the majority of its compensation for recordkeeping the Plan from asset-based revenue-sharing.

104.    Because revenue sharing arrangements provide asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a record-keeper receives — as well as other compensation such as interest earned on assets moving into and out of the Plan, called "float" — to ensure that the record-keeper is not receiving unreasonable compensation.

105.    Mercer's compensation has increased dramatically during the Class Period. The chart below shows the growth in Mercer's compensation on a per-participant basis from 2010 to 2014, the last year for which disclosures are available.



106.    Market prices for mega-plans like the Plan are typically considerably lower. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42

and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

107.     Because of the excessive recordkeeping fees and excessive investment management fees, as described above, the Plan was excessively expensive.

108.     Combining recordkeeping fees with other fees paid by the Plan and its investment options, the Total Plan Cost (including investment management and recordkeeping) for the Plan in 2014 was 58.4 bps.[13] In 2013, the Total Plan Cost for the Plan was 58.5 bps. The mutual fund industry itself reports that the average plan with over $1 billion in assets had total plan costs of 31 bps in 2013. BrightScope and Investment Company Institute, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans* 47 (Dec. 2015).

109.     Accordingly, in 2013 the Plan was 88% more expensive than the average Plan with over $1 billion in assets, even though the Plan had over $3 billion in assets and fees generally drop as assets increase. This represents a difference of over $9 million in 2013 alone.

110.     Defendants failed to prudently monitor and control the compensation paid for recordkeeping and administrative services in light of the services provided, particularly the asset-based revenue sharing received by Mercer, and therefore caused the Plan participants to pay unreasonable expenses for administering the Plan.

---

[13] Although Defendants suggested to participants that excessive revenue sharing payments were rebated to the Plan, any such rebates were not, upon information and belief, large enough to materially change these calculations.

111.    Defendants failed to prudently monitor and control Mercer's recordkeeping compensation to ensure that only reasonable fees were charged for recordkeeping and administrative services.

112.    Finally, in June, 2016, Defendants set a flat percentage for Mercer's recordkeeping fee of 8 bps, with any revenue sharing received above that threshold returned to the Plan. However that fee continues to be excessive. For example, an 8 bps fee would be over $66 per participant based on the Plan's 2014 Department of Labor filings. Further, because it is based on the amount of assets and not based on the amount of services Mercer is providing, is susceptible to the same problems as the revenue-sharing this new fee is designed to replace.

113.    The policy to distribute revenue sharing payments to the Plan appears to have been adopted in 2016. Upon information and belief based on the date of the adoption of the policy, prior to 2016 Defendants either kept revenue sharing payments or transferred those payments to Mercer, in either case to the detriment of the Plan and its participants.

114.    Had Defendants ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost well over $8 million in their retirement savings through unreasonable recordkeeping fees.

## VI.    ERISA'S FIDUCIARY STANDARDS

115.    ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants  as fiduciaries of the Plan. ERISA § 404(a), 29 U.S.C.§ 1104(a), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest  of the participants and beneficiaries and —

(A)            for the exclusive purpose of:

   (i)            providing benefits to participants and their beneficiaries; and

      (ii)            defraying reasonable expenses of administering the plan; [and]

    (B)            with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and  familiar with such matters would use in the conduct of an enterprise of like  character and with like aims;

    (C)            by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]

116.    ERISA also imposes co-fiduciary duties on plan fiduciaries. ERISA § 405,  29 U.S.C. § 1105, states in relevant part that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following  circumstances:
>
> > (1)  if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission  is a breach;
> >
> > (2)  if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a  fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3)  if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

117.    Under ERISA, fiduciaries who exercise discretionary authority or control over the selection of plan investments and the selection of plan service providers must act prudently and solely in the interest of participants and beneficiaries of the plan when performing such  functions. Thus, "the duty to conduct an independent investigation into the merits of a particular  investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

118.    As the Department of Labor explains,

[T]o act prudently, a plan fiduciary must consider, among other factors, the  availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the Plan to forego other  investment opportunities, such investments would not be prudent if they provided  a plan with less return, in comparison to risk, than comparable investments  available to the plan, or if they involved a greater risk to the security of plan  assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

119.    Pursuant to these duties, fiduciaries must ensure that the services provided to the

plan are necessary and that the fees are reasonable:

Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries … in determining which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable . . .

DOL Opinion 97-15A (1997); DOL Opinion 97-16A (1997).

120.    A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of  plan

participants and beneficiaries. As the Department of Labor has warned:

[T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and beneficiaries, as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives.  In other words, in deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the  interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by non-economic factors unless the investment ultimately  chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988). The Department of Labor has

repeatedly warned:

While the law does not specify a permissible level of fees, it does require that fees

charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

*Meeting Your Fiduciary Responsibilities*, U.S. Dep't of Labor Employee Benefits Security Admin.

(Feb. 2012), http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

121.    In a separate publication, the Department of Labor writes:

The Federal law governing private-sector retirement plans, the Employee   Retirement Income Security Act (ERISA), requires that those responsible for  managing retirement plans -- referred to as fiduciaries -- carry out their  responsibilities prudently and solely in the interest of the plan's participants and  beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that  the services provided to their plan are necessary and that the cost of those services  is reasonable.

* * *

Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently  select and monitor plan investments, investment options made available to the  plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

* * *

By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related  services generally are assessed as a percentage of assets invested. Employers   should pay attention to these fees. They are paid in the form of an indirect charge  against the participant's account or the plan because they are deducted directly  from investment returns. Net total return is the return after these fees have been  deducted. For this reason, these fees, which are not specifically identified on  statements of investments, may not be immediately apparent to employers.

*Understanding Retirement Plan Fees and Expenses*, U.S. Dep't of Labor Employee Benefits Security

Admin. (Dec. 2011), http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

122.    ERISA § 409, 29 U.S.C. § 1109, provides, inter alia, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or  duties imposed on fiduciaries by Title I ERISA shall be personally liable to make good to the  plan any losses to the plan resulting from each such breach and to restore to the plan any profits  the fiduciary made through use of the plan's assets. ERISA § 409, 29 U.S.C. § 1109, further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

## VII.    CLASS ALLEGATIONS

123.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan fiduciary, participant, beneficiary, or the Secretary of Labor to bring a suit individually on behalf of the Plan to recover for the Plan the remedies provided under ERISA § 409, 29 U.S.C. § 1109(a).

124.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of:

> All participants in the Edward D. Jones & Co. Profit Sharing and 401(k) Plan from August 19, 2010 to the date of judgment. Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.

125.    Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

(a)    The class satisfies the numerosity requirement of Rule 23(a) because it is composed of over one thousand persons, in numerous locations. The number of class members is so large that joinder of all its members is impracticable.

(b)    The class satisfies the commonality requirement of Rule 23(a) because there are questions of law and fact common to the Class and these questions have common

answers. Common legal and factual questions include, but are not limited to: (a) who are the fiduciaries liable for the remedies provided by ERISA § 409(a), 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by causing the Plan to invest in excessively expensive funds and by failing to prudently remove the funds from the Plan; whether the decision to include and not to remove a fund was made solely in the interests of Plan participants and beneficiaries; what are the losses to the Plan resulting from each breach of fiduciary duty; whether Defendants cause the Plan to engage in prohibited transactions; and what are the benefits to any breaching fiduciary as a result of the use of Plan assets by the fiduciary.

(c)    The class satisfies the typicality requirement of Rule 23(a) because Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims, and the claims of all Class members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct. Plaintiffs were investors in the Plan during the Class Period.

(d)    The class satisfies the adequacy requirement of Rule 23(a). Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

(e)    Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of

34

establishing incompatible standards of conduct for Defendants. Class action status also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

(f)     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

(g)     In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VIII.   CLAIMS FOR RELIEF

### First Claim for Relief: Breached of Fiduciary Duty In Connection With Selecting And Maintaining Plan Investments.

126.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

127.     Defendants are responsible for selecting, monitoring, and removing investment options in the Plan.

128.    Defendants caused the Plan to invest billions of dollars in imprudent investment options, many of which were more expensive than prudent alternatives and unlikely to outperform their benchmarks.

129.    Defendants chose investment options for the Plan offered by Preferred Partners and Partners, that is, mutual fund families that paid hundreds of millions of dollars to Edward Jones over the Class Period.

130.    Defendants failed to remove the funds even though a prudent fiduciary would have done so given the high fees, poor performance prospects, and availability of better-performing, lower-cost alternatives.

131.     By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the  participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A).

132.    Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B).

133.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess investment management and other fund-related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA §409, 29 U.S.C. §1109, and ERISA §502(a)(2), 29 U.S.C. §1132(a)(2).

## Second Claim For Relief: Failure to Defray Plan Expenses

134.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

135.    Defendants are responsible for selecting, monitoring, negotiating with and removing the Plan's Record-keeper.

136.    Defendants caused the Plan to pay, directly or indirectly, tens of millions of dollars to Mercer during the Class Period. Mercer's compensation, and the Total Plan Costs, were excessive and unreasonable given the services provided.

137.    Defendants failed to monitor and control these costs despite lower-cost recordkeeping alternatives.

138.     By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A).

139.    Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B).

140.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA §409, 29 U.S.C. §1109, and ERISA §502(a)(2), 29 U.S.C. § 1132(a)(2).

## IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.     A declaration that the Defendants breached their fiduciary duties under 29 U.S.C. §1104;

B.     An order compelling the disgorgement of all fees paid and incurred, directly or indirectly, to Edward Jones and its affiliates by the Plan or by mutual funds revenue-sharing with Edward Jones as a result of the Plan's investments in their funds, including disgorgement of profits thereon;

C.     An order compelling the Defendant to restore all losses to the Plan arising from Defendants' violations of ERISA, including lost-opportunity costs;

D.     An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

E.     Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's investments in revenue-sharing mutual funds;

F.     An order certifying this action as a class action, designating the Class to receive  the amounts restored or disgorged to the Plan, and imposing a constructive trust for distribution of those amounts to the extent required by law;

G.     An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     An order awarding Plaintiffs and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or the Common Fund doctrine, and post-judgment interest; and

I.      An order awarding such other and further relief as the Court deems equitable and just.

Dated: February 10, 2017                    Respectfully submitted,

                                            /s/ Jeffrey R. Baron
                                            Jeffrey R. Baron , Bar #54713
                                            Gregory Y. Porter, *pro hac vice* to be filed
                                            Mark G. Boyko, Bar #57318, *admission pending*
                                            Bailey Glasser LLP
                                            8012 Bonhomme Avenue
                                            Suite 300
                                            Clayton, MO  63105
                                            Telephone: (314) 863-5446
                                            Facsimile: (314) 863-5483
                                            jbaron@baileyglasser.com
                                            gporter@baileyglasser.com
                                            mboyko@baileyglasser.com

                                            Robert A. Izard
                                            Mark P. Kindall
                                            IZARD KINDALL & RAABE LLP
                                            29 South Main Street, Suite 305
                                            West Hartford, CT 06107
                                            Telephone: (860) 493-6292
                                            Facsimile: (860) 493-6290
                                            rizard@ikrlaw.com
                                            mkindall@ikrlaw.com

                                            Edward W. Ciolko
                                            Donna Siegel Moffa
                                            Mark K. Gyandoh
                                            Julie Siebert-Johnson
                                            KESSLER TOPAZ MELTZER & CHECK, LLP
                                            280 King of Prussia Rd.
                                            Radnor, PA 19087
                                            Telephone: (610) 667-7706
                                            Facsimile: (610) 667-7056
                                            eciolko@ktmc.com
                                            dmoffa@ktmc.com
                                            mgyandoh@htmc.com
                                            jsjohnson@ktmc.com

                                            *Attorneys for Plaintiffs*

39